UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

**KEIWON D. SWAYZER**

**VERSUS**                                                          **CIVIL ACTION NO. 07-78-JVP-DLD**

**COMMISSIONER OF SOCIAL SECURITY**

## MAGISTRATE JUDGE'S REPORT

This social security case comes before the Court on claimant's memorandum in support of complaint (rec. doc. 4), which the court will treat as an appeal. The Commissioner has filed an opposition.

### *Background*

Claimant seeks judicial review of a final decision of the Commissioner denying his claim for continuation of his Title XVI supplemental security income (SSI) benefits. In making that final decision, the Commissioner reached the fifth and final step of the five-step sequential disability analysis set forth in 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f).[1] The Commissioner determined that the now twenty-year old claimant has borderline intellectual functioning[2] with no past relevant work history. Although the Commissioner found that this impairment had prevented the claimant from having any past relevant work as a minor, the claimant nonetheless had the residual functional capacity to perform

---

[1] *See, e.g.*, *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).

[2] The claimant originally had been receiving benefits as a minor with mild mental retardation, but was re-evaluated once he reached majority status based on the adult standard of disability. The laws regarding childhood disability were amended in August 1996 to include a more stringent definition of disability for children. Also, under the amended law, some children already receiving benefits were now required to re-evaluated under the adult standard of disability once they turned eighteen.

unskilled entry level work at all exertional levels.  Applying Rule 204.00 of the medical-vocational guidelines, the Commissioner determined that Mr. Swayzer therefore was not disabled within the meaning of the Social Security Act.

The administrative record includes the following medical evidence concerning the claimant's mental condition.

On March 5, 1991, claimant's grandmother, Lethie Swayzer, filed an application on behalf of claimant for supplemental security income via telephone.[3]  (TR 25-28). A favorable disability determination of mental retardation was issued on June 17, 1991, with an onset date for disability purposes of March 1, 1991.  This determination was based on two reports: one from the East Baton Rouge Parish School Board dated February 2, 1991, and a third party report dated May 6, 1991. (TR 42-44).

Subsequent to the favorable disability determination of June 17, 1991,and pursuant to a continuing disability review, the claimant was tested by clinical psychologist Ann Goodrich on August 10, 2000, using the WISC-III scale. The following scores were noted in the record: V-57, P-54, F-52 (TR 46 and 232).[4]  Dr. Goodrich stated that she believed

---

[3]Claimant's birthdate is December 2, 1985, and he was therefore a minor at the time of the application for benefits. Also, according to the record, another application was filed on August 1, 1991, this time in person. (TR 29-41) Because a favorable disability determination was issued on June 13, 1991, the court is unable to ascertain the purpose of the second, albeit longer, application of August 1, 1991.

[4] The Wechsler Preschool and Primary Scale of Intelligence (WPPSI) is an intelligence test for children ages 2 years 6 months to 7 years 3 months.  The record indicates that on May 11, 1991, claimant's test results on the WPPSI were: V-65 (verbal), P-76 (performance), F-67 (full-scale). (TR 46).  There is no explanation in the record as to whether or not these results were considered during the initial determination in June 1991.

The Wechsler Intelligence Scale for Children (WISC), is an intelligence test for children between the ages of 6 and 16. Claimant was tested in 2000 using the WISC-III, the most current available version at that time.

the test results were an accurate assessment of claimant's overall intellectual functioning at that time.  (TR 231-232) These scores placed the claimant within the "intellectually deficient range for Verbal, Non-Verbal and Full Scale Intellectual Abilities. *Id.* Dr. Goodrich further stated that, "in and of themselves, these scores would suggest a diagnosis of Mild Mental Retardation," and "it is unlikely that Keiwon would be able to obtain and sustain gainful employment of moderate to complex nature as an adult, only simple task oriented jobs..." *Id.* Dr. Goodrich also stated that the scores were consistent with previous testing, although slightly lower than his previous scores, which Dr. Goodrich found to be not uncommon where children with mental disabilities are retested at later ages.

On September 13, 2000, examiner John Rogers completed a Request for Medical Advice form directed to a pediatric psychologist, stating that the current "psych testing" documents a decrease in cognition, and that the claimant now "meets 112.05C." (TR 237). On September 15, 2000, the Childhood Disability Evaluation Form was completed by yet another psychologist, who indicated that the claimant met the requirements of Listing 112.05C, for mild mental retardation.[5]  No testing of claimant's residual functioning capability was conducted at that time.

On September 18, 2000, following claimant's WISC-III testing, a re-evaluation disability determination of mild mental retardation was issued, and claimant continued to receive Supplemental Security Income benefits as a minor child. (TR 45-51).

Thereafter, again as part of a continuing disability review, albeit this time under the Adult Standard in lieu of the Child Standard, claimant was examined on May 13, 2004, at

---

[5]The signature of this psychologist is illegible but it is not signed by Dr. Goodrich. Listing 112.05C was amended and is now known as Listing 12.05C.

the offices of Alan L. Taylor and Associates, Inc., for an assessment of his mental status and intellectual functioning by way of the WAIS-III test. [6] Claimant was 18 years old and would shortly acquire a Certificate of Achievement from Baker High School,[7] where claimant had a history of self-contained special education services. Claimant's WAIS-III scores were V-70, P-63, and F-64 -- which placed his overall intellectual performance in the mild mental retardation range. The examiner noted that claimant's comprehension skills "did appear to be somewhat limited from time to time." (TR238-244).

The Mental Status Examination of the claimant revealed that he was oriented to person, time, and place, and could identify three objects, the former and current presidents, days of the week, seasons of the year, and months of the year. He could repeat the alphabet with five omissions. He could not spell "world," but he could spell "paint" forward and backward. He could comprehend literal statements, but not abstract generalizations. The examiner believed that the claimant was using his best efforts during the evaluation, and that the results obtained were accurate ones. His DSM-IV diagnostic impression was as follows[8]:

---

[6] The Wechsler Adult Intelligence Scale - 3rd Edition. Claimant was then 18 years old.

[7] Claimant also reported that he had a history of self-contained special education services.

[8] The DSM-IV organizes each psychiatric diagnosis into five levels (axes) relating to different aspects of disorder or disability:

> Axis I: clinical disorders, including major mental disorders, as well as developmental and learning disorders
> Axis II: underlying pervasive or personality conditions, as well as mental retardation
> Axis III: Acute medical conditions and physical disorders.
> Axis IV: psychosocial and environmental factors contributing to the disorder
> Axis V: Global Assessment of Functioning or Children's Global Assessment Scale for children under the age of 18. (on a scale from 100 to 0)

    Axis I:        No Diagnosis

    Axis II:       317 - Mild Mental Retardation (to be Confirmed/Ruled Out with Adaptive Assessment

    Axis III:      None Reported

    Axis IV:      History of Special Education Placement
                        Lack of Relationship with Mother
                        Inconsistent Contact with Father

    Axis V:       GAF = 65[9]

The examiner, however, did not perform a formal assessment of claimant's adaptive functioning as it was not requested, but stated a formal assessment of adaptive assessment would be necessary to confirm or rule out a diagnosis of mild mental retardation. (TR 238-241) During the evaluation, the examiner also considered the Activities of Daily Living Form and the psychological evaluation by Ann Goodrich, Ph.D., of September 12, 2000, in forming his opinion.

Claimant was again examined on September 27, 2004, at the offices of Alan L. Taylor and Associates, Inc., this time for assessment of his mental status and adaptive functioning. The claimant had no history of alcohol, drug or tobacco use; reported no symptoms of depression, anxiety, psychosis, suicidal or homicidal thoughts or plans; and had no history of counseling or mental health treatment. The claimant was not taking any prescription medications and appeared to be in good health. The claimant occasionally demonstrated limited comprehension skills, but did well with concrete examples. The

---

[9] Global Assessment of Functioning (GAF) is a numeric scale (0 through 100) used by mental health clinicians and doctors to rate the social, occupational and psychological functioning of adults. *See* DSM-IV-TR.

Mental Status Examination was consistent with the results from the May 2004 visit, except that claimant's thought rate appeared "somewhat slow" during this evaluation.

During the September 2004 visit, the SIB-R was administered to assess the claimant's adaptability in various areas of life.[10] Claimant's adaptive levels were found to be limited in the areas of social interaction and communication, and community living skills.[11] Claimant's adaptive levels were found to be in the range of "limited to age appropriate" in the areas of motor skills, personal living skills, and broad independence. (TR 242-245). In this evaluation, as in the May evaluation, claimant reported that he did not drive, could cook basic items, but could could not wash his clothing. The examiner opined that his intellectual functioning was previously at the high end of the mild mental retardation range, but that the adaptive assessment indicated adaptive functioning more consistent with a diagnosis of borderline intellectual functioning. *Id.* His DSM-IV diagnostic impression was as follows:

| | |
|---|---|
| Axis I: | No Diagnosis |
| Axis II: | V62.89 - Borderline Intellectual Functioning |
| Axis III: | None Reported |
| Axis IV: | History of Special Education Placement<br>Lack of Relationship with Mother<br>Inconsistent Contact with Father |
| Axis V: | GAF = 65 |

---

[10] The Scales of Independent Behavior - Revised (SIB-R) is a test which measures adaptive behavior in the areas of motor skills, communication, social interaction, personal living, community living, and any maladaptive behaviors.

[11] Claimant's percentile rankings in these areas placed him in the 3-4% range. Claimant's highest percentile rankings (19%) were in the area of motor skills and personal living skills.

Thereafter, on October 13, 2004,[12] a Psychiatric Review Technique assessment completed by a state agency medical consultant indicated that the claimant had a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. Claimant had no indications of decompensation.

Included in this assessment was a rating of functional limitation, which concluded that the claimant had either a mild or moderate degree of limitation in four areas, but no marked or extreme degrees of limitation. (TR 247-263). In particular, the functional capacity assessment indicated that claimant was markedly limited in only two specific areas: the ability to understand and remember detailed instructions and the ability to carry out detailed instructions. Otherwise, the claimant's scores indicated either no significant limitations or only moderate limitations in the remaining 16 areas of testing.

The mental residual functional capacity assessment indicated that claimant retained the capacity for simple work, but not the capacity for complex tasks or detailed instructions. Claimant's adaptive assessment therefore indicated that his adaptive functioning is more consistent with a diagnosis of borderline intellectual functioning rather than mild mental retardation.[13]

Based on these evaluations, claimant's disability ceased as of October 1, 2004, and his eligibility for benefits terminated at the end of December 2004.

---

[12]Although this assessment was conducted in October 2004, the psychiatrist did not execute the report of the evaluation until January 2005.

[13]Claimant was evaluated as an adult under Listing 12.02, organic mental disorders, and not Listing 12.05, mental retardation. Specifically, the disorder was "borderline intellectual functioning" under the category "A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above [dysfunctions of the brain evidenced by various symptoms.]"

The claimant timely filed a request for hearing, and the hearing was held on February 6, 2006.  Claimant was unrepresented at the hearing, and only the claimant and his great aunt testified.[14]  The ALJ considered the testimony, the test results from East Baton Rouge Parish Pupil Appraisal Services of January 1991 (mild mental retardation range), the psychological test results of Ann Goodrich, Ph.D. in September 2005 (mild mental retardation range), the WAIS-III test results of May 2004 (mild mental retardation range),  the SIB-R test results of September 2004 (borderline intellectual functioning), and the October 2004/January 2005 Psychiatric Review Technique assessment and the accompanying mental residual functional capacity assessment.

During the hearing, the claimant reported that he received no regular medical treatment and takes no prescription medicine.  The claimant has a driver's license and occasionally rakes leaves for his neighbors to make money.  He also helps with household chores such as folding clothes, mowing the yard, and washing his grandmother's vehicle.

The ALJ considered the diagnostic characteristics of claimant's impairment, and then the functional limitations resulting from the impairment, all in keeping with the specific analysis set forth in Section 404.1520 and 416.920 of the regulations.  This is a two-part analysis, and in this case, the ALJ found that the claimant was diagnosed with borderline intellectual functioning ("BIF") based on the most recent testing, and BIF is a condition characteristic of the disorders contained within Listing 12.02.  Under Listing 12.02, the ALJ must determine what functional limitations the claimant has as a result of his condition, and those functional limitations are described in Listing 12.02 B and 12.02 C.  The ALJ must

---

[14]The hearing transcript indicates that Thomas Mungall, a vocational expert, was present, but he did not testify.

first determine if claimant meets the criteria set forth in Listing 12.02 B before moving on to Listing 12.02 C.  For mental impairment due to the diagnosis of BIF to be found under Listing 12.02 B, claimant must meet at least two of the following criteria:

    1.     Marked restriction of activities of daily living; or

    2.     Marked difficulties in maintaining social functioning; or

    3.     Marked difficulties in maintaining concentration, persistence, or pace; or

    4.     Repeated episodes of decompensation, each of extended duration.

The claimant did not meet any of the required criteria under Listing 12.02 B.  The ALJ then moved on to examine whether or not claimant met the criteria under Listing 12.02 C.

The ALJ indicated that, although borderline intellectual functioning is a "severe" impairment under 20 CFR §416.920,  the claimant failed to present any argument that he has a condition which meets or equals the requirements of a listed impairment under Appendix 1, Subpart P, Regulation No. 4.  Moreover, it was  not apparent from the medical records that the claimant meets or equals the requirement of a listed impairment in that the claimant's adaptive functioning is substantially higher than his actual IQ scores, which the ALJ found was "evidenced by his ability to perform activities of daily living in an independent fashion." (TR 21)   The claimant required no assistance to perform such tasks as caring for his personal needs, driving a car, doing laundry, washing cars, raking leaves, and shopping for groceries.  The ALJ indicated that these tasks were not unlike tasks found in some types of substantial gainful activity.   The ALJ found that, in light of the inconsistencies in the record and the testimony, the claimant's allegations of disability were not totally credible.

The ALJ then considered whether the claimant retained the residual functional capacity to perform work existing in significant numbers in the national economy.[15] "Residual functional capacity" is defined in the Regulations as the most the claimant can still do after considering how his physical and/or mental limitations affect his ability to perform work-related tasks.[16] The ALJ considered all symptoms, the objective medical evidence, medical opinions, and other evidence in determining claimant's residual functional capacity.  Thereafter, the ALJ found that the claimant had the ability to perform unskilled entry level work at all exertional levels.

Based on this determination, and the fact that the claimant had no past relevant work, the burden shifted to the Social Security Administration to show that, consistent with claimant's residual functional capacity, age, education, and work experience,[17] there are jobs existing in the national economy which the claimant can perform.  The ALJ considered this information in conjunction with the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations.  Under the guidelines, claimant's borderline intellectual functioning did not preclude him from having the ability to perform simple unskilled entry level work at all exertional levels; therefore, the ALJ found that the claimant was not disabled and no longer eligible for Supplemental Security Income payments.  (TR 17-24).

---

[15]See 20 CFR §416.929 and SSR 96-7p.

[16]See 20 CFR §416.945 and SSR 96-8p.

[17]Under 20 CFR §416.963, the claimant is considered a "younger" individual.  Also, the claimant has a high school equivalent education ("Certificate of Achievement").

### *The Present Appeal*

On the present appeal, the claimant contends that (1) the ALJ failed in his duty of developing the record and in not considering the complete set of limitations associated with claimant's mental impairment, and that 2) the ALJ incorrectly evaluated claimant's mental impairment under Listing 12.02 (Organic Mental Disorders) instead of Listing 12.05 (Mental Retardation). The claimant maintains that the overwhelming evidence and past reviews indicate that claimant should continue to be evaluated under Listing 12.05, and that the ALJ erred in using Listing 12.02. Claimant also argues that the ALJ had a duty to investigate the facts and develop the arguments both for and against granting benefits. (Rec. doc. 4)

### *Governing Law*

In reviewing the Commissioner's decision to deny benefits, the Court is limited to a determination of whether the Commissioner's decision was supported by substantial evidence existing in the record as a whole and whether the Commissioner applied the proper legal standards. *E.g., Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). In applying the "substantial evidence" standard, the Court must carefully scrutinize the record to determine if, in fact, substantial evidence supporting the decision does exist; but the Court may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute its judgment for the Commissioner's even if the evidence preponderates against the Commissioner's decision. *Id.* Substantial evidence means more than a scintilla, but less than a preponderance, and is such relevant evidence as a reasonable mind might accept to support a conclusion. *Id.* A finding of "no substantial evidence" will be made only where

there is a conspicuous absence of credible choices or an absence of medical evidence contrary to the claimant's position.  *Id.*

The overall burden of proving disability under the Social Security Act rests on the claimant.  *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983).  If a claimant proves that he no longer is able to work in his prior job (or in this case, has no past relevant work) because of his impairment, then the burden shifts to the Commissioner to show that there is some other type of substantial gainful activity that the claimant can perform.  *Id.*  Thus, in cases such as this one where the Commissioner determines that the claimant has no past relevant work and accordingly reaches the fifth step of the five-step disability sequential analysis, the Commissioner bears the burden of establishing that there is other work in the economy that the claimant can perform.  *Perez v. Schweiker,* 653 F.2d 997, 999-1000 (5th Cir. 1981).  In determining whether the claimant can do any other work, the Commissioner considers the claimant's residual functional capacity, together with age, education, and work experience, according to the Medical-Vocational Guidelines set forth by the Commissioner. See 20 C.F.R. § 404.1561.  If the Commissioner adequately points to potential alternative employment, the ultimate burden of persuasion then returns to the claimant to prove his inability to perform those jobs.  *Kraemer v. Sullivan*, 885 F.2d 206 (5th Cir. 1989); *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Fruge v. Harris*, 631 F.2d 1244, 1246 (5th Cir. 1980).

***Discussion***

Claimant argues that the ALJ failed in his duty of developing the record and in not considering the complete set of limitations associated with claimant's mental impairment.  Claimant also asserts that he meets Listing 12.05C based on his IQ scores and the ALJ's

finding at Step Two that he suffers from a severe impairment, borderline intellectual functioning.[18]  In order to meet Listing 12.05 for mental retardation, an individual (1) must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22" and (2) must satisfy the criteria listed in Subsection A, B, C, or D. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. The required level of severity for mental retardation is met when the claimant has a "valid verbal, performance, or full scale IQ of 59 or less." Id. at § 12.05(B). Section 12.05(C) defines an impairment to include a valid verbal, performance, or full scale I.Q. score of 60-69 inclusive, and a physical or other mental impairment imposing additional and significant work-related limitations of function. Section 12.05(D) defines an impairment to include a valid verbal, performance, or full scale IQ of 60-70, resulting in at least two of the following: 1) marked restriction of daily living; or 2) marked difficulties in maintaining social functioning; or 3) marked difficulties in maintaining concentration, persistence, or pace; or 4) repeated episodes of decompensation, each of extended duration.

As indicated by the record, claimant's last WISC III test revealed the following scores: V-70, P-63, F-64.  Further, the Psychiatric Review Technique assessment conducted in 2004 indicated that the claimant had a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace, and no indications of decompensation. According to the evidence in the  record, claimant did not meet the criteria set forth in

---

[18]This argument encompasses two wholly different diagnoses: 12.02 - borderline intellectual functioning and 12.05 - mild mental retardation.  Thus, the court will address both separately.

12.05, and his test results were indicative of borderline intellectual functioning, a definition contained within Listing 12.02, an organic mental disorder.

The ALJ acknowledged that the claimant's impairment was a "severe" impairment, in accordance with 20 CFR §416.920, but also noted that the impairment does not meet or medically equal one of the listed impairments. Moreover, claimant did not put forth any arguments or evidence that his impairment meets or medically equals one of the listed impairments.

On the foregoing record, the ALJ acted well within his discretion in resolving the inconsistencies in the record and in the various test results spanning more than 15 years to find that the claimant was not precluded from working. The ALJ was not bound by the childhood test results indicating that the claimant was disabled due to mild mental retardation. The claimant was re-evaluated once he turned 18 using the Adult Standard for disability, and the results of the various evaluations indicated that the claimant was not disabled as his adaptive functioning was higher than his borderline intellectual functioning. The court further is unpersuaded by the claimant's argument that the ALJ failed to adequately develop the record – the record is replete with testing conducted over the years, all of which was taken into account.

On the record presented, the ALJ considered all the evidence, including the evidence that the claimant's adaptive functioning is substantially higher than his actual IQ scores, and acted within his discretion in finding that the claimant's allegations of disability are not totally credible.

**RECOMMENDATION**

For the foregoing reasons, the Magistrate Judge recommends that the decision of the Commissioner denying benefits be affirmed, and that the claimant's complaint be **DISMISSED**.

Signed in Baton Rouge, Louisiana, on August 7, 2008.

**MAGISTRATE JUDGE DOCIA L. DALBY**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

KEIWON D. SWAYZER

VERSUS                                                    CIVIL ACTION NO. 07-78-JVP-DLD

COMMISSIONER OF SOCIAL SECURITY

### NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U.S. District Court.

In accordance with 28 U.S.C. §636(b)(1), you have ten days from date of receipt of this notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report. A failure to object will constitute a waiver of your right to attack the factual findings on appeal.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Signed in Baton Rouge, Louisiana, on August 7, 2008.

_____
**MAGISTRATE JUDGE DOCIA L. DALBY**